**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION**

**STANLEY H. NUZZI,**                                                        **PLAINTIFF,**

**v.**                                        **CASE NO. 2:17-CV-2018**

**USA TRUCK, INC.,**                                              **DEFENDANT.**

**MEMORANDUM BRIEF IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Stanley H. Nuzzi has brought two causes of action against his current employer, Defendant USA Truck, Inc. ("USA Truck").  First, he claims that USA Truck violated the Americans with Disabilities Act, 29 U.S.C. § 12112(a), by failing to offer him a reasonable and effective accommodation for his alleged disability.  In this motion for summary judgment, USA Truck will argue that this failure-to-accommodate claim fails as a matter of law because: (1) Plaintiff is not a "qualified individual with a disability" with the meaning of the ADA, and (2) he does not have sufficient evidence from which a reasonable jury could find that USA Truck failed to act in good faith in response to his requests for accommodation.

Second, Plaintiff claims that USA Truck violated 29 U.S.C. § 12203(a) by taking adverse action against him in retaliation for engaging in accommodation request and complaint activity protected by the ADA.  USA Truck will argue that Plaintiff's retaliation claim also fails as a matter of law, because he has no evidence he suffered an adverse employment action after engaging in protected activity. Therefore, he cannot make a prima facie case of disability retaliation.

1

## Facts

USA Truck is a "trucking company" engaged in hauling general goods and commodities in interstate commerce throughout the United States (Ex. 1, ¶ 3).  Its headquarters and corporate offices are located in Van Buren, Arkansas (Id.).

On September 18, 2013, USA Truck hired Plaintiff as an over-the-road driver operating commercial tractor-trailer combinations of the type commonly seen on the roads (Ex. 1, ¶ 5; Ex. 2, pp. 50, 57-58).  At the time he was hired, and throughout his employment with USA Truck, Plaintiff possessed a Class A Commercial Driver's License issued by the State of Alabama, and he was fully certified and qualified to drive tractor-trailers and commercial motor vehicles generally (Ex. 1, ¶ 6; Ex. 2, pp. 190, 195).  Plaintiff's job duties as an over-the-road driver included driving, completing his hours of service logbook, fueling the tractor and checking its oil and fluid levels, and making all legally required vehicle inspections prior to operation (Ex. 2, pp. 58-60).  For the first two years of his employment (until he was transferred, for reasons discussed below, to a 'dedicated' route in September 21, 2015), Plaintiff was dispatched to haul freight throughout the lower forty-eight States in a generally unpredictable manner that was dictated by the day-to-day needs of the company and its customers (Ex. 1, ¶ 7; Ex. 2, pp. 60-61).  While doing this nationwide driving, Plaintiff earned four days each month of 'home time,' which he was required to schedule in advance so his dispatchers could work the request into the freight schedule and route him home (Ex. 1, ¶ 8; Ex. 2, pp. 177-178).  Plaintiff is compensated a fixed amount for each mile driven under a paying load, with the exception of 'short hauls' of less than 150 miles, for which he is paid a flat rate based on the distance driven, but capped at $75.00 (Ex. 1, ¶ 9; Ex. 2, pp. 58).

In 2014, while employed by USA Truck, Plaintiff was diagnosed with mitral valve prolapse (MVP), which he describes as "a faulty valve" in his heart (Ex. 2, pp. 88-90, 179-181).  Essentially,

MVP "is a condition in which the two valve flaps of the mitral valve do not close smoothly or evenly, but instead bulge (prolapse) upward into the left atrium" of the heart.[1]  To monitor the status of his MVP, Plaintiff is required to submit to a multi-day testing regimen every three to four months (Ex. 2, pp. 187-190, 239).  This testing occurs in the office of Plaintiff's heart doctor in Dothan, Alabama, and it consists of a stress test, an ultrasound scan, a circulation test, and wearing a Holter Monitor for several days to record his heart rhythm (Id.).  Plaintiff testified his MVP is currently only very mildly symptomatic.  He believes he "occasionally" sleeps longer than usual as a result of this condition, but these periods of extended sleep do not interfere with his ability to drive a commercial motor vehicle (Ex. 2, pp. 183-184).  Plaintiff also claims to experience occasional, transitory bouts of "weakness" and "shortness of breath," which he attributes to his MVP (Ex. 2, p. 180).  Finally, he claims his mitral valve "flutters" in stressful situations, such as confrontations with his dispatchers, but if he takes Aleve, eats something, and lays down, this resolves (Ex. 2, pp. 185-186).  Plaintiff's MVP is the only heart condition from which he suffers (Ex. 2, p. 181).

Plaintiff testified that, on the whole, his MVP has had virtually no impact on his activities of daily living.  It does not interfere at all with his ability to drive a commercial motor vehicle generally, or his ability to drive a tractor-trailer combination specifically (Ex. 2, pp. 186, 192).  Both before and after he was diagnosed with MVP in 2014, Plaintiff was medically certified and recertified to drive under U.S. Department of Transportation standards (Ex. 2, pp. 90).  In fact, in August 2017, immediately prior to his deposition, Plaintiff renewed his Commercial Driver's

---

[1]  http://www.heart.org/HEARTORG/Conditions/More/HeartValveProblemsandDisease/Problem-Mitral-Valve-Prolapse_UCM_450441_Article.jsp#.WcFmHIxSxhE, American Heart Association, accessed October 5, 2017.

License in Alabama, and in doing so he was medically recertified to drive a commercial motor vehicle (Ex. 2, pp. 175-177). For these recertification processes, Plaintiff's heart doctor has given multiple written clearances for Plaintiff to continue driving commercially (Ex. 2, pp. 200-207). Currently, Plaintiff is fully qualified and medically certified to drive a commercial motor vehicle, and he continues to drive for USA Truck (Ex. 1, ¶ 19; Ex. 2, pp. 82, 89-90, 195).

Turning now to activities other than work and driving, Plaintiff testified his MVP sometimes interferes with his ability to ride a bicycle and his ability to cut the grass because he "can't breathe," and he states he cannot walk as far as he once could (Ex. 2, pp. 187, 190-191). However, he also testified that he tries to "walk a mile, mile and a half per day," and that he rides a bicycle with his son when he is home in Dothan, so his limitations with respect to these activities are slight and apparently intermittent (Id.). It is undisputed that Plaintiff's doctors have not placed any restriction whatsoever on his ability to do anything (Ex. 2, pp. 192-193, 225). In fact, very much to the contrary, Plaintiff's heart doctor has specifically instructed him to exercise and to "keep on pushing myself as hard as I can," and to do "as much as I can do" (Ex. 2, pp. 191, 192).

The only other medical condition on which Plaintiff seems to base his claim to disability is a cancer found in a polyp in his colon, which he believes occasionally makes him "weak" and causes "bloody stools" (Ex. 2, pp. 72-74, 192-194). However, he did not testify that this condition affects his day-to-day activities in any substantial way (Ex. 2, p. 194).

Plaintiff's failure-to-accommodate claim arises out of the previously-mentioned fact that three to four times per year he is required to submit to a multi-day regimen of cardiac testing and monitoring to determine whether his MVP has worsened. This testing requires him to be physically present in Dothan, Alabama, for several days. In 2014, after he was first diagnosed with MVP, Plaintiff apparently did not have any difficulty getting home to Dothan for this

4

monitoring, and did so four times (Ex. 2, pp. 179, 230-231).   However, he missed two appointments in early 2015, one for an ultrasound and the other for a circulation test, because he was on the road and unable to get home to Dothan (Ex. 2, pp. 227-228, 230-231).   Apparently, Plaintiff then engaged counsel, and on February 20, 2015, Plaintiff's attorney sent USA Truck a letter requesting reasonable accommodation for Plaintiff's MVP under the Americans with Disabilities Act (Ex. 2, p. 227, dep. ex. S).   In that letter, Plaintiff's attorney stated that Plaintiff "has sent notice of his appointments to USA Truck, but the company has failed to make reasonable accommodation to allow him to get to his appointments" (Id.).   No new accommodation was requested, however, but only for USA Truck to get Plaintiff home to Dothan in time for his scheduled MVP monitoring appointments.

On March 11, 2015, USA Truck's then-Human Resources Manager Wayland Parker wrote to Plaintiff's attorney in response to this accommodation request letter (Ex. 1, ¶ 13, att. A; Ex. 2, pp. 232, dep. ex. T).   In his response, Mr. Parker stated that the company had not been aware of any monitoring appointments prior to March 2015, but that

> [i]f you or Mr. Nuzzi could provide our company with a list with his appointment dates a couple weeks in advance of the scheduled appointment we will be able to make sure that he is home for scheduled appointment [sic].   I have discussed Mr. Nuzzi's request with Mr. Nuzzi's management team and they have assured me in good faith that they can have Mr. Nuzzi home for his appointments so long as they are given advance notice of his appointment. … We are happy to accommodate his request.

(Id.).[2]   Despite missing these monitoring appointments in early 2015, Plaintiff was able to reschedule them, and he did not suffer any adverse medical consequences from having missed the appointments (Ex. 2, pp. 237-238).

---

[2]  At deposition, Plaintiff did not recall having ever seen this response letter, but he did not deny that he, or possibly his counsel to whom it was specifically addressed, may have actually received the letter (Ex. 2, pp. 232-234).

It is not entirely clear from Plaintiff's deposition testimony, but it appears that over the next six months or so after this exchange of letters in early 2015, Plaintiff was able to schedule and attend his MVP monitoring appointments without issue (Ex. 2, pp. 235-236).   But in September 2015, he was not able to get to Dothan in time for a scheduled appointment and he complained to his dispatchers (Id.).   On September 21, 2015, in response to this latest missed appointment, Plaintiff was moved by USA Truck from the irregular-route nationwide driving he had been doing for the previous two years to the company's dedicated service, in which Plaintiff provided services dedicated to the business of a single customer of USA Truck: Georgia-Pacific (Ex. 1, ¶ 14; Ex. 2, pp. 61-62, 81).   This dedicated route has freight origin and destination points located solely in the southeastern United States (although the specific points and routes will vary based on Georgia-Pacific's needs), and this remains Plaintiff's current assignment (Ex. 1, ¶¶ 15, 16, 19; Ex. 2, pp. 61-62, 80-82).   Plaintiff admits he was specifically told by USA Truck dispatchers Tommy Dyer and Ron Rogers that he was being transferred to this dedicated route for the purpose of making it easier to get him home to Dothan for his medical appointments (Ex. 2, pp. 238-239).   So this was a further attempt by USA Truck to accommodate Plaintiff's medical needs.

At deposition Plaintiff did not complain that this transfer to the Georgia-Pacific dedicated route resulted in less pay or less favorable working conditions, or that it was otherwise less desirable than his previous driving assignment.   In fact, he admitted that he has had more time at home while driving this dedicated route than he did while previously driving a nationwide, irregular-route schedule (Ex. 2, pp. 81-82).   Typically, Plaintiff is now home every five to six days, although on several occasions since March 2017 (Plaintiff states it has been "four times at the max"), he has driven for seven or eight days before returning home (Ex. 2, pp. 74-79, 120).   Also,

6

it is undisputed that since the September 2015 transfer it has been easier for Plaintiff to get home to Dothan for his medical appointments (Ex. 2, pp. 111-112, 238).  Plaintiff remains currently employed by USA Truck as a driver assigned to its Georgia-Pacific dedicated route (Ex. 1, ¶ 19; Ex. 2, pp. 82, 160).

## Argument

USA Truck will argue in Section I below that Plaintiff's failure-to-accommodate claim fails as a matter law for two reasons.  First, Plaintiff has no evidence to show that he is a "qualified individual with a disability" within the meaning of the ADA; therefore, he cannot make the prima facie case of disability discrimination that is the necessary prerequisite to bringing a cause of action for failure to accommodate.  Second, even if Plaintiff is a qualified individual with a disability, he does not have sufficient evidence from which a reasonable jury could find that USA Truck failed to act in good faith in response to his requests for accommodation.

In Section II below, USA Truck will argue that Plaintiff's disability retaliation claim fails as a matter of law because he has no evidence from which a reasonable jury could find that he suffered an adverse employment action after engaging in protected activity.  Because both of Plaintiff's causes of action fail as a matter of law, his Complaint should be dismissed with prejudice.

## I.

## Plaintiff's failure-to-accommodate claim fails as a matter of law.

The ADA does permit a cause of action against an employer for failing to engage in good faith in the interactive process designed to find a reasonable accommodation for an employee suffering from a covered disability.  However, this kind of failure-to-accommodate claim is especially difficult to push past the summary judgment stage since the plaintiff must produce

evidence sufficient for a reasonable jury to find two related, but distinct, sets of elements.  The first set of elements is a prima facie case of disability discrimination, which acts as a gatekeeper for the second set of elements, which constitutes the actual cause of action for failure to engage in good faith in the interactive accommodation process.  Schaffhauser v. UPS, Inc., 794 F.3d 899, 905 (8th Cir. 2015).

The prima facie case of disability discrimination, which is the prerequisite to a failure-to-accommodate claim, requires that Plaintiff produce evidence from which a reasonable jury could find:

1) He is "disabled" within the meaning of the ADA;

2) He is a "qualified individual" within the meaning of the ADA; and

3) He suffered an adverse employment decision because of his disability.

Id.  If Plaintiff successfully produces evidence sufficient to satisfy this prima facie case, then he must go on to "establish a failure to accommodate his disability."  Id.  This requires him to produce evidence sufficient to satisfy the following elements of the cause of action for failure to engage in good faith in the interactive accommodation process:

1) USA Truck knew about Plaintiff's disability;

2) Plaintiff requested accommodation or assistance for his disability;

3) USA Truck did not make a good faith effort to assist him in seeking accommodation; and

4) USA Truck could have accommodated Plaintiff but for its lack of good faith.[3]

---

[3] Again, this is not a prima facie case, but rather the elements of a cause of action, since the ultimate issue in a failure-to-accommodate claim is not the employer's intent but whether the employer fulfilled its affirmative obligation to reasonably accommodate a disability (thus the traditional McDonnell-Douglas framework for finding intent is not applicable).  Peebles v. Potter, 354 F.3d

Id., p. 906.  USA Truck contends that this failure-to-accommodate claim fails as a matter of law because Plaintiff cannot prove that he is disabled within the meaning of the ADA (thus he cannot make the initial prima facie case of disability discrimination), and also because he does not have evidence from which a reasonable jury could find that USA Truck failed to make good faith efforts to assist him in seeking accommodation (thus he cannot satisfy the elements of the cause of action for failure to accommodate).

A.    <u>Plaintiff cannot make a prima facie case of disability discrimination because he is not disabled.</u>

As mentioned, Plaintiff must successfully make a prima facie case of disability discrimination as a prerequisite to moving on to proof of his cause of action for failure to accommodate.  To prove the first element of that prima facie case, Plaintiff must produce evidence from which a reasonable jury could find that he suffers from a disability within the meaning of the ADA, which defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1).  "Major life activities" include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).  The standard for determining whether an individual is "substantially limited" in one or more of these major life activities was loosened somewhat by the ADA Amendments Act of 2008 (ADAAA),

761 (8th Cir. 2004).

but an individual must still have some significant limitation on his or her ability to function, since "not every impairment will constitute a disability:"

> An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

29 C.F.R. § 1630.2(j)(ii).   Substantial limitation is an individualized inquiry, focusing on the specific abilities and limitations of the individual in question.   29 C.F.R. § 1630.2(j)(iv).

Plaintiff fails to meet any standard of substantial limitation since the undisputed facts show that his MVP places almost no limitation on his ability to function.  Most notably, his doctors have placed no restriction whatsoever on his ability to work, or to do anything else (Ex. 2, p. 192).  He testified that periodic episodes of "shortness of breath" and "weakness" sent him to the doctor in 2014, at which time the MVP was discovered, but he denies any current symptoms except for occasionally sleeping an abnormally long time and what he describes as occasional 'fluttering' of his mitral valve in stressful situations (Ex. 1, pp. 180-181, 182-184).  The abnormally long sleep may or may not be attributable to his MVP – there is no evidence in the record either way – but he testified it has no effect on his ability to drive, and it does not have an obvious effect on any other major life activity (Ex. 2, p. 184).  As for the 'valve flutter,' it apparently appears only under stress – such as getting pressure from his supervisor – but it resolves with Aleve and rest, and he did not testify it actually causes any affirmative impairment in his ability to drive or do anything else (Ex. 2, pp. 185-186).  He testified that "[s]ometimes I can't ride a bike because of [the MVP]," but this limitation is clearly only intermittent since he testified elsewhere that he does in fact ride a bicycle with his son when he is home in Dothan (Ex. 2, pp. 187, 190-191).  Riding a bicycle is not a major

life activity in any event.  Pedroza v. Autozone, Inc., 536 F.Supp.2d 679, 696 (W.D. Tex. 2008)("ability to exercise by walking, biking, and jogging cannot meet the threshold of definition of disability for purposes of the ADA").  Plaintiff also testified that he has trouble cutting the grass because of breathing issues and that he "can't walk as far as I used to" (Ex. 2, pp. 190, 191).  Cutting the grass is not a major life activity; and while walking is, Plaintiff elsewhere contradicted himself by testifying he tries to walk mile and a half a day for exercise (Ex. 2, p. 191).  A person who can walk a mile and a half at a time is not substantially limited in his ability to walk.  Wood v. Crown Redi-Mix, Inc., 339 F.3d 682 (8th Cir. 2003)(inability to walk more than a quarter mile without resting was a "moderate" limitation, not a substantial one).  And not only is Plaintiff not particularly limited in his ability to engage in ordinary physical activities, his heart doctor has actually encouraged him to exercise and to "keep on pushing myself as hard as I can" (Ex. 2, p. 191).  Further, Plaintiff makes no claim that his condition adversely affects his ability to drive in any way (Ex. 2, p. 186).  On this undisputed evidence – directly out of Plaintiff's mouth – it is clear that his alleged limitation caused by his MVP (and his colon cancer) is very minor to non-existent, and only intermittent when present.

On this evidence of impairment, no reasonable jury could find that Plaintiff is substantially limited in any major life activity, even under the more lenient standard mandated by the ADAAA. There is no evidence he is limited to any extent at all in his ability to work: in fact, he testified he works with his MVP "no problem" (Ex. 2, p. 186).  And his MVP has posed no obstacle to his continued DOT driving certification: he has been consistently certified to drive under DOT medical standards, and his heart doctor has consistently provided medical clearances for him to drive commercially (Ex. 2, pp. 200-207).  The standard for establishing substantial limitation in the context of a person's ability to work is whether he is "significantly restricted in the ability to

perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." Dovenmuehler v. St. Cloud Hospital, 509 F.3d 435, 440 (8th Cir. 2007). There is no evidence Plaintiff's MVP restricts him from performing any jobs at all, let alone a broad range of jobs. His heart doctor has certainly not restricted him in any way, but has instead encouraged Plaintiff to 'push' himself. On this evidence, no reasonable jury could find that Plaintiff is substantially limited in his ability to work.

The only other major life activity that appears to be implicated by Plaintiff's deposition testimony is his ability to breathe, which the EEOC's regulations do specifically identify as a major life activity. 42 U.S.C. § 12102(2)(A). But Plaintiff complains only of occasional shortness of breath and difficulty mowing his lawn due to breathing difficulties, symptoms that might be claimed by a significant number of non-disabled people, but which in any event do not impose a substantial limitation on his ability to breathe. Hurst v. Falcon Air Express, Inc., 2014 WL 12689268, * 5 (W.D. Ariz. 2014)("shortness of breath" caused by atrial fibrillation did not raise genuine issue of fact concerning disability); Carper v. TWC Services, Inc., 820 F.Supp.2d 1339, 1352 (S.D. Fla. 2011)("shortness of breath" and other related symptoms did not create a substantial limitation on any major life activity); Baker v. CSX Transportation, Inc., 546 F.Supp.2d 90, 99 (W.D. Tex. 2008)(occasional "shortness of breath" with exertion, coupled with other symptoms, did not establish a substantial limitation). There is no evidence Plaintiff is substantially limited in his ability to breathe.

On this evidence, no reasonable jury could find that Plaintiff is substantially limited in his ability to work, breathe, or engage in any other major life activity. At most, he is very mildly limited as compared to the general population. Therefore, Plaintiff cannot make an initial prima

facie case of disability discrimination and fails to satisfy this necessary prerequisite to proving his failure-to-accommodate claim, which should be dismissed as a matter of law.

B.  <u>Even if Plaintiff can show he is disabled, he cannot show that USA Truck failed to make good faith efforts to accommodate him.</u>

Even assuming Plaintiff can show he is a qualified individual with a disability protected by the ADA, no reasonable jury could find on the evidence presented that USA Truck failed to make good faith efforts to accommodate him.  Therefore, Plaintiff's failure-to-accommodate claim fails as a matter of law because he cannot prove the third element of the cause of action.

An accommodation for a disability "need only be reasonable, not perfect," and an employer is not required to provide the accommodation preferred by the employee.  <u>Sharbono v. Northern States Power Co.</u>, 218 F.Supp.3d 1004, 1016 (8th Cir. 2016).  USA Truck nevertheless did provide the accommodation requested by Plaintiff, which was to be routed home to Dothan for his scheduled MVP monitoring appointments.  Plaintiff agrees he had no difficulty getting to his appointments in 2014, after his MVP was first diagnosed (Ex. 2, pp. 179, 230-231).  At that point he had not specifically made a request for accommodation, but USA Truck nevertheless specifically worked with him to accommodate his need to be in Dothan for his doctor's appointments.  However, in early 2015, Plaintiff apparently ran into some difficulty getting home for appointments, so in February of that year he hired a lawyer to write a letter to USA Truck specifically requesting the accommodation of permitting him to get home for his appointments (Ex. 2, p. 227, dep. ex. S).  In early March 2015, USA Truck responded in writing, stating that "[w]e are happy to accommodate this request" and asking that Plaintiff provide his appointment dates at least two weeks in advance – which was certainly not an unreasonable request (Ex. 1, ¶ 13, att. A; Ex. 2, pp. 232, dep. ex. T).

13

According to Plaintiff, there were several occasions when this accommodation process broke down in 2015 while he was on the road, and as a result he did not get home when he needed (Ex. 2, pp. 235-236). USA Truck then sought to address this problem in September 2015 by transferring him to the Georgia-Pacific dedicated route that kept him in the southeastern United States, nearer to Alabama (Ex. 1, ¶¶ 14-16; Ex. 2, pp. 61-62, 81). Plaintiff testified he was expressly told by dispatchers Tommy Dyer and Ron Rogers that he was being transferred to this dedicated route for the specific purpose of making it easier to get him home – i.e., he was told that it was part of the continuing effort by USA Truck to accommodate his needs (Ex. 2, pp. 238-239). This transfer was not requested by Plaintiff, so it demonstrates that USA Truck was actively looking for ways to better accommodate his needs in light of the recent difficulties in getting him home. Plaintiff testified this transfer did in fact make it easier for him to get home for his appointments, and that he was at home more often and more reliably than before (Ex. 2, pp. 81-82, 238). He made no complaint at deposition that he earned less money as a result of this transfer (to the contrary, his rate per mile rose from 38.5¢ to 49¢), nor did he complain he has been otherwise unhappy with this change (Ex. 1, ¶ 10). To all appearances, it suits him.

Even so, apparently there have been several occasions, even after the transfer, when Plaintiff has had difficulty getting home in time to meet his medical appointments. In 2016, he had to reschedule an appointment when dispatcher Michael Byer told him he was unaware of the appointment and there was "nothing they could do" (Ex. 2, pp. 111-112). In April 2016, Plaintiff had to reschedule an appointment for three weeks later because he was required to haul a load to Cincinnati (Ex. 2, pp. 148-150). However, Plaintiff testified that later, in October 2016, he had a "positive" meeting with dispatchers Tommy Dyer and Bobby Price at the company's corporate office in Van Buren during which the dispatchers reiterated their goal of getting Plaintiff home

14

when he needed (Ex. 2, pp. 117-118, 123-125).  Clearly, they had been aware of recent difficulties and sought to reassure him they would continue to do their best to get him home for scheduled doctor's appointments for which he gave adequate notice.  Plaintiff also testified that since his transfer to the Georgia-Pacific route in September 2015, there have been a few times – "four at the max" – when he drove for seven or more days before getting home, which disturbs him because he was promised home time every five to five and a half days (Ex. 2, pp. 120-121).  But this is relevant only if the extended periods on the road caused him to miss MVP monitoring appointments, and it is not at all clear they did.[4]

USA Truck does not dispute that from time to time there has been some difficulty in getting Plaintiff home from his driving duties precisely when he needed for his MVP monitoring appointments.  But that is simply the nature of the business the parties are in.  USA Truck is contractually obligated to carry loads for Georgia-Pacific in a prompt and timely manner, and the timing of those loads and the geographical locations of their origin and destination points is determined by Georgia-Pacific, not by USA Truck (Ex. 1, ¶ 15; Ex. 2, pp. 80-81, 136-137). Therefore, the situation has occasionally required – and will certainly require again – Plaintiff to remain on the road hauling freight for more days than is typical or expected, or for longer than he or USA Truck might prefer (Ex. 1, ¶ 15).  But, again, an accommodation need only be reasonable in the circumstances, not perfect.  Sharbono, *supra*.  The fact the accommodation offered to Plaintiff in this case has not always worked does not mean that USA Truck has not acted in good

---

[4]  According to Plaintiff, there was an incident in 2016 where he was told he would not get home when he expected, but he testified he wanted to be in Dothan not for medical reasons but to be with his son (Ex. 2, pp. 105-111).  He also testified he did not get home when he wanted on another occasion in 2016, but that also was not related to his MVP but instead to his daughter being injured on a school bus (Ex. 2, pp. 124).

faith.   To the contrary, USA Truck has continued to engage Plaintiff in the interactive accommodation process, and the company has done what it reasonably could do in the circumstances presented.   Also, as Plaintiff agrees, on those occasions when he did miss appointments he was able to accommodate himself in another way by rescheduling them, and he testified he has suffered no adverse medical repercussions as a result of this rescheduling (Ex. 2, pp. 237-238).

Since Plaintiff cannot produce evidence from which a reasonable jury could find that USA Truck failed to act in good faith with respect to the accommodation of Plaintiff's (assumed) disability, Plaintiff cannot satisfy the third element of his cause of action for failure to accommodate and it should be dismissed as a matter of law.

## II.

## Plaintiff's ADA retaliation claim fails as a matter of law.

Plaintiff also claims he was retaliated against in violation of the ADA for requesting reasonable accommodation for his alleged disability, and for opposing what he believes to have been a failure to accommodate him.   At deposition, Plaintiff offered no direct evidence suggesting that any employee of USA Truck harbored an intent to retaliate against him, so he must prove his retaliation claim circumstantially, through the use of the usual McDonnell-Douglas burden-shifting analysis.  Oehmke v. Medtronic, Inc., 844 F.3d 748, 758 (8th Cir. 2016).  To show he has a viable claim of disability retaliation, Plaintiff must initially produce evidence sufficient to make the following prima facie case:

1)  He engaged in statutorily protected activity;

2)  He suffered a materially adverse employment action; and

3)  There was a causal causation between his protected activity and the adverse action.

16

Id.  To satisfy the third element of this prima facie case, Plaintiff must produce evidence sufficient to show a 'but for' causal connection between his assertion of rights and the adverse action.  Univ. of Texas Southwestern Medical Center v. Nassar, 133 S.Ct. 2517 (2013).  If he succeeds in making this prima facie case, then the burden of production shifts to USA Truck to produce evidence of a non-retaliatory motive for its actions, which Plaintiff must rebut with additional evidence from which a reasonable jury could find retaliatory intent.  However, USA Truck contends that the burden of production never shifts from Plaintiff because he cannot produce evidence sufficient to show that he suffered an adverse employment action after he engaged in protected activity.

A.      Plaintiff's only protected activity was filing his EEOC charge against USA Truck.

Plaintiff initially filed his EEOC charge against USA Truck with the Alabama office of the EEOC on or about December 24, 2015 (Ex. 2, pp. 244-246, dep. ex. U).  That office then forwarded Plaintiff's charge to the Little Rock Area Office of the EEOC, which received it on January 4, 2016 (Id.).  Notice of Plaintiff's EEOC Charge was then received by USA Truck by mail sometime after March 10, 2017 (which was the signing date stated on the "Notice of Charge of Discrimination" that USA Truck received in the mail from the Little Rock Area Office) (Ex. 1, ¶ 21; Ex. 2, pp. 245-247).  USA Truck was not aware of Plaintiff's charge prior to receiving the Notice of Charge of Discrimination in the mail (Ex. 1, ¶ 21).

USA Truck does not dispute that when Plaintiff filed his EEOC charge, he engaged in protected activity under the so-called "participation clause" of 42 U.S.C. § 12203(a), which protects an employee from retaliation "because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  So any putative adverse action taken against Plaintiff after March 11, 2016 (the earliest date USA

17

Truck could have become aware Plaintiff's EEOC charge) could theoretically constitute actionable retaliation for the act of filing that charge.

However, the story is quite different for actions and events that occurred prior to March 11, 2016, when USA Truck was not aware of the charge and Plaintiff was simply requesting accommodation and making complaints directly to the company.  That conduct is governed by the so-called "opposition clause" of 42 U.S.C. § 12203(a), which protects an employee from retaliation "because such individual has opposed any act or practice made unlawful by this chapter."  To successfully proceed under the opposition clause, Plaintiff must show that he had "a good faith, objectively reasonable belief that his activity [was] protected by statute" when he complained to USA Truck about its alleged violation of the ADA.  Heyne v. HGI-Lakeside, Inc., 589 F.Supp.2d 1119, 1126 (S.D. Iowa 2008)(citing Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1118 (8th Cir. 2006)); *also*, Foster v. Time Warner Entertainment, Co., 250 F.3d 1189, 1194 (8th Cir. 2001)(an employee engages in protected activity when expressing opposition "based on a reasonable belief that the employer has engaged in discriminatory conduct," citing EEOC v. HBE Corp., 135 F.3d 543, 554 (8th Cir. 1998)).  That is to say, Plaintiff must "demonstrate that he had an objectively reasonable belief that his requests to receive accommodation … were statutorily protected activity."  Heyne, *supra*, p. 1127.  Since the ADA requires an employer to provide a reasonable accommodation only to a qualified individual with a disability, it follows that Plaintiff must show he had an objectively reasonable belief he was such a disabled person when he requested accommodation and when he complained to USA Truck about the alleged lack or insufficiencies thereof.  42 U.S.C. § 12112(a).

For example, in Heyne, *supra*, the plaintiff failed to make this showing as a matter of law. Heyne, a casino dealer, suffered from chronic back pain from an automobile accident.  The pain

was exacerbated by prolonged standing, although he was able to stand for up to five hours at a time.  After a change in casino ownership, he was required by the new management to stand for an entire eight-hour shift.  He produced a note from his doctor stating he needed to be permitted to sit for one hour after standing for two.  The casino was unwilling to provide this accommodation, however, and Heyne was placed on leave until he could find a standing position he could perform. In addition to claiming disability discrimination, Heyne also brought a retaliation claim, alleging that his request to the casino for accommodation was protected activity.  But the district court held that Heyne could not prove an objectively reasonable belief in statutorily protected activity because he could not reasonably believe he was a qualified individual with a disability.  He was restricted by his doctor to two hours of standing, but he nevertheless engaged in "a variety of physically strenuous tasks which included kitchen remodels, bathroom remodels, siding, windows, drywalling, painting, and electrical work," and "even his own attending physician does not believe Heyne is disabled."  Id., p. 1127.  The district court held that since Heyne could not have reasonably believed he had a protected disability, he could not prove the first element of his prima facie case of retaliation so that claim failed as a matter of law.

Similarly, in this case Plaintiff could not have had an objectively reasonable belief that he has a protected disability because – as argued in Section I(A) above – no reasonable jury could find that he is disabled by his MVP and/or his colon cancer within the meaning of the ADA.  And – crucially for Plaintiff's retaliation claim – the issue is not even close, since he is only very mildly impaired, and even then intermittently, so he could not have entertained an objectively reasonable belief of disability.  That being that case, Plaintiff's requests for accommodation, together with his complaints about the efficacy of the accommodation offered, did not constitute protected opposition activity under 42 U.S.C. § 12203(a).  Therefore, as a matter of law Plaintiff cannot base

19

a claim for retaliation on his requests for accommodation, or on his complaints made directly to USA Truck, or on anything else he did prior to filing his EEOC charge.  This finding has the effect of limiting the universe of possible retaliatory actions to those actions that occurred after March 11, 2016 (the earliest possible date on which USA Truck could have become aware of Plaintiff's EEOC charge).

B.     Plaintiff cannot show he suffered an adverse employment action after March 11, 2016.

To be adverse for the purpose of a retaliation claim, an employment action must have effected a material change in the plaintiff's terms and conditions of employment, such as "termination, reduction in pay or benefits, and changes to employment that significantly affect an employee's future career prospects[.]"  Kelleher v. Wal-Mart Stores, Inc., 817 F.3d 624, 633 (8th Cir. 2016)(quoting Spears v. Mo. Dept. of Corr. & Human Res., 210 F.3d 850, 853 (8th Cir. 2000)). "[M]inor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities" will not serve as an adverse employment action for this purpose, nor will intermediate disciplinary action that resulted in no tangible, material consequence.  Id.; also, Watson v. Heartland Health Laboratories, Inc., 790 F.3d 856, 864 (8th Cir. 2015); Warr v. Hagel, 14 F.Supp.3d 1244, 1252 (E.D. Mo. 2014).

There is no evidence showing that Plaintiff suffered any adverse employment action after March 11, 2016.  His pay rate per mile was increased to 49¢ when he was transferred to the Georgia-Pacific dedicated route in September 2015, and that remains his current rate and his current assignment (Ex. 1, ¶¶ 10, 19).  Further, in 2016 (after filing his charge) Plaintiff earned approximately 22% more money driving for USA Truck than he did prior to his charge in 2015, earning $51,270.45 in 2016, as compared to $42,039.43 in 2015 (Ex. 1, ¶¶ 10, 19).  And he is currently on track to earn somewhere in the neighborhood of $50,000.00 again in 2017 (Ex. 1, ¶

20

12).  So not only has Plaintiff not suffered a materially adverse employment action since March 11, 2016, but he actually fared *better* in 2016 and 2017, and while working in the same dedicated driving assignment.

Nevertheless, at deposition Plaintiff claimed to have suffered five adverse actions in 2016 that he believes support his retaliation claim.  First, he testified that in January 2016 he missed an MVP monitoring appointment because he was on the road, which required him to reschedule the appointment for "[a]bout a month later" (Ex. 2, pp. 151-152).  He does not, however, recall the specific details of this incident (Id.).  Missing a doctor's appointment and having to reschedule it is not an adverse employment action, especially since Plaintiff specifically testified he suffered no adverse medical consequences from having to reschedule the missed appointment (Ex. 2, pp. 237-238).  He did testify that he was charged a $400 fee for a missed appointment by his heartless heart doctor, but that was not a decision made by USA Truck and it cannot be imputed to the company (Ex. 2, pp. 156-57).  Requiring Plaintiff to do his job, and in the process occasionally keeping him on the road longer than he expects or desires, is not an adverse employment action.

Second, on August 15, 2017, Plaintiff was given a "Written Reprimand – Final" for refusing to accept a load and hanging up on dispatcher Bobby Price (Ex. 1, ¶ 20, att. C; Ex. 2, pp. 127-129, 152, dep. ex. A).  However, Plaintiff suffered no material or tangible loss as a result of this disciplinary warning: he suffered no loss of pay or benefits, he was not transferred to a less favorable shift or route, and he remains employed by USA Truck on the same terms and conditions as before (Ex. 1, ¶ 20).  Therefore, this was the type of intermediate disciplinary action without tangible consequence that is not an actionable adverse employment action.  Thomas v. Corwin, 483 F.3d 516, 528 (8th Cir. 2007)(disciplinary memoranda was not adverse employment action where the plaintiff's terms and conditions of employment did not change); Baucom v. Holiday

Companies, 428 F.3d 764, 768 (8th Cir. 2005)(plaintiff's "many disciplinary warnings" were not adverse employment actions where the terms and conditions of his employment were not changed on the basis of them). Also, Plaintiff testified he has received no other formal disciplinary action from USA Truck (Ex. 2, pp. 151-152).

Third, Plaintiff testified that in 2016 dispatcher Bobby Price called him on the road to inform him that Price would not be able to get Plaintiff home to be with his son when he wanted (Ex. 2, pp. 105-106). When dispatcher Tommy Dyer called Plaintiff shortly after that conversation, the two of them got into an argument and Plaintiff hung up on Dyer (which was the motivation for the formal disciplinary action discussed above) (Ex. 2, pp. 106-111). Plaintiff also testified that Price and Dyer were sometimes unpleasant with him on the telephone (Ex. 2, pp. 143). These were ordinary workplace disagreements and interpersonal friction, however; not the kind of materially adverse employment action that will support a retaliation claim.

Fourth, Plaintiff complains that beginning in October 2016 (more than a year after he was assigned to the Georgia-Pacific dedicated route) he occasionally drove for seven or more days before getting back home, rather than the five to six days he believed he was promised (Ex. 2, pp. 74-75, 119-120). However, he testified this only occurred "two or three times, maybe four at the max" in the two years he has been assigned to the Georgia-Pacific route (Ex. 2, p. 120). He did not testify that being on the road for longer than five to six days resulted in anything more tangible than his own disgruntlement and inconvenience. He certainly suffered no reduction in pay since he was driving and earning compensation by the mile during that additional time on the road. This, also, was not a materially adverse employment action.

Finally, Plaintiff complains that when he drove a certain route between Darlington, South Carolina, and a Georgia-Pacific facility near Charlotte, North Carolina, he received only "fifty

22

dollars" in driving pay when the route is more 200 miles (Ex. 2, pp. 152-155, 242-243, 246-247). This issue is a case in which Plaintiff simply does not have his facts right.  In early 2017, Plaintiff did haul a load for Coyote Logistics between Darlington, South Carolina, and Mount Gilead, North Carolina (east of Charlotte), for which he was paid $48.51 (Ex. 1, ¶¶ 17-18).  This was not a Georgia-Pacific load, but a load brokered for an unknown third-party shipper by freight broker Coyote Logistics (Id.).  USA Truck accepted this brokered load in order to fill Plaintiff's trailer with paying freight on what would have otherwise been an empty-trailer run from Darlington to a Georgia-Pacific facility in Charlotte (where Plaintiff was scheduled to pick up a load) (Id.)  For this brokered run from Darlington to Mount Gilead, Plaintiff was credited for pay purposes with driving 99 miles, which – at his rate of 49¢ per mile – yielded a total route pay of $48.51, just about the fifty dollars about which he complains[5] (Ex. 1, ¶¶ 17-18, att. B). So Plaintiff is right that he was paid roughly fifty dollars for this run, but wrong about the actual distance driven.  This was not an adverse employment action against him, but rather his normal and correct pay.

None of these allegations offered by Plaintiff constitute an adverse employment action against him.  Therefore, his claim for disability retaliation fails as a matter of law because he suffered no adverse employment action after the key date of March 11, 2016.

---

[5] Ninety-nine miles is actually a generous mileage allowance, since the driving directions given by Mapquest.com show a distance of 71.9 miles between Darlington, SC, and Mount Gilead, NC. https://www.mapquest.com/directions/from/us/sc/darlington/to/us/nc/mount-gilead,    accessed October 5, 2017.

## **Conclusion**

Plaintiff's Complaint should be dismissed in its entirety because he is not disabled within the meaning of the ADA; because he cannot prove that USA Truck failed to engage in good faith in the interactive accommodation process; and because he cannot show that he suffered an actionable adverse employment action at any time after he engaged in protected activity.

U SA TRUCK, INC., Defendant

Joseph F. Gilker, Ark. Bar No. 85219
GILKER AND JONES, P.A.
9222 North Highway 71
Mountainburg, Arkansas 72946
Telephone: (479) 369-4294
E-mail:  gilkerlaw@aol.com


By: /s/Joseph F. Gilker_____
         Joseph F. Gilker


## CERTIFICATE OF SERVICE

I, Joseph F. Gilker, hereby certify that I have served a true and correct copy of the foregoing BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT by filing same with the Court using the CM/ECF system, which will serve electronic notice of filing on the following individual, this 12th day of October, 2017.

Patrick L. Doman
LAW OFFICE OF PATRICK L. DOMAN
285 S. Foster Street
Dothan, Alabama 36301

/s/Joseph F. Gilker_____
Joseph F. Gilker

24